OPINION
{¶ 1} Appellants Amy Richardson and Franklin Richardson ("Mother", individually, "Father", individually, and "Parents", collectively) appeal the March 27, 2007 Entry entered by the Muskingum County Court of Common Pleas, Juvenile Division, which terminated their parental rights, privileges and responsibilities with respect to their two minor children, and granted permanent custody of the children to Appellee Muskingum County Children Services ("the Department").
 STATEMENT OF THE CASE AND FACTS {¶ 2} Mother and Father are the biological parents of twin boys, Joshua Richardson (DOB 4/8/05) and Jordan Richardson (DOB 4/8/05). On June 6, 2005, the infants were placed in voluntary foster care after Mother contacted the Department requesting such placement due to her health issues. Mother advised the Department Father was unable to take care of the twins as he needed to take her to the hospital. The Department conducted a team decision meeting on September 28, 2005, during which Mother stated she was not ready to have the twins home as she remained severely depressed. On October 4, 2005, the Department filed a Complaint, alleging Joshua and Jordan were dependent children, and requesting temporary custody of the boys, or alternatively, protective supervision. With the agreement of Parents, Joshua *Page 3 
and Jordan were placed in the temporary custody of the Department on October 18, 2005. The trial court appointed attorney Ruthellen Weaver as guardian ad litem for Joshua and Jordan.
 {¶ 3} The trial court conducted an Adjudicatory/Dispositional Hearing on February 14, 2006. Parents admitted Joshua and Jordan were dependent children and agreed the boys should remain in the temporary custody of the Department. Although part of her initial agreement with the Department, Mother did not sign a release for medical records until sometime in March, 2006. The Department received voluminous medical records from a number of hospitals and emergency rooms as well as records from other agencies. After reviewing the records, the Department filed a Motion for Permanent Custody on May 30, 2006, as the information received indicated Mother has a severe medication seeking problem. Father denies Mother has a problem. The trial court originally scheduled a hearing on the motion for September 11, 2006. However, the matter was not heard until February 21, and 27, 2007, due to a number of requests for continuances by Parents. The guardian ad litem filed her report on February 20, 2007, recommending permanent custody be granted to the Department.
 {¶ 4} The following evidence was adduced at the hearing.
 {¶ 5} Melissa Keylor, a supervisor with Guernsey County Children's Services, ("GCCS") testified GCCS began its involvement with the family in 1998. During GCCS's involvement relative to Franklin and Chad Richardson, concerns arose, including Mother's mental health issues and Parents' substance abuse issues, specifically seeking drugs through emergency rooms of hospitals. Keylor noted there was one allegation of domestic violence against Father. With respect to James McTheny, *Page 4 
Brandon McTheny, and Mark McTheny, Mother's three children from a previous relationship, Keylor explained GCCS originally removed the children due to domestic violence between Mother and the children's biological father, as well as concerns about substance abuse. During either mental health counseling or drug and alcohol counseling, Mother admitted she had used cocaine and was using alcohol on a regular basis, including during her pregnancy. Mother had been discharged from two outpatient substance abuse treatment centers and one inpatient treatment center. Keylor added GCCS was granted permanent custody of Franklin, Chad, and a daughter, Tiffany, but she could not give details as to the reasons for the original removal of the children from Parents' home.
 {¶ 6} Sarah Darby, a caseworker with GCCS, testified she was the caseworker for Franklin, Chad, and Tiffany. GCCS became involved with the family due to Parents' parenting skills, domestic violence, and mental health issues. Tiffany had been removed on a prior occasion as Mother was in jail and Father had left the child with a babysitter and not returned to pick up the child. Darby recalled Parents were not compliant with their case plan, failing to sign releases for medical and counseling records. Parents did not show appropriate parenting skills with Franklin, Chad, and Tiffany. When asked whether she believed Parents were fully invested in being parents to these children, Darby answered, "No. Not all the time, no." February 21, 2007. Tr. at 32. Darby added Parents delegated their responsibilities, leaving the children with people whom they did not know as well as leaving the children for long periods of time. Darby stated GCCS had concerns about Mother's drug seeking behaviors. *Page 5 
 {¶ 7} Christina Starling, a family stability worker with the Department, testified she has been supervising Parents' visits with Jordan and Joshua for approximately one year. Starling noted the visits proceeded satisfactorily, however, Mother and Father caused a lot of chaos before and during the visits. Parents leave the visitation room and workers have to redirect them back to the children. Mother had threatened Starling during visits. Starling stated Mother and Father do not interact a great deal with the children, although Father interacts more than Mother during the visits. During one visit, Mother allowed one of the twins to chew on a balloon, and became hostile when Starling removed the balloon from the child's mouth.
 {¶ 8} Laine Davis testified she has been the ongoing caseworker for Joshua and Jordan since the case opened in June, 2005. Davis explained the case opened after Mother called the Department requesting the children be placed in foster care. At that time, Mother was experiencing vaginal bleeding and was severely depressed. An agency worker proceeded to Parents' home and spoke with Mother and Father. Mother informed the worker she was going to call an ambulance to take her to the hospital and Father needed to go with her and, as such, Father would not be able to care for the children and she wanted them placed in foster care. The Department conducted a team decision meeting the next day and Parents voluntarily placed the children in foster care for thirty days.
 {¶ 9} The thirty days passed, however, Mother was still not doing well and was scheduled to have surgery in September, 2005. Parents signed another agreement to keep Joshua and Jordan in voluntary placement for another thirty days. Mother underwent surgery in early September, but advised the Department she was not ready *Page 6 
to have the twins returned to the home. Parents signed a third voluntary agreement sometime in September, 2005. At a team decision meeting on September 28, 2005, the Department made plans to return the children to Parents' care, however, during the meeting, Mother informed the Department she was not ready to have the twins back as she was still depressed. Thereafter, the Department filed a Complaint, alleging Joshua and Jordan to be dependent children. The Department continued to make efforts to reunify the family. In early December, 2005, Davis discussed with Parents allowing the children to be with them Monday, Tuesday, Thursday, and Fridays from 9:00am to 8:00pm, and on Sundays from 9:00am to 6:00pm, then gradually working towards overnight visits. Following the court hearing, Mother approached Davis and informed the caseworker her doctor at Six County did not believe Mother was ready to have the boys for that length of time on any given day. The Department continued the 5:00pm to 8:00pm schedule in effect.
 {¶ 10} The Department held a team decision meeting in January, 2006, to again discuss returning the twins to Mother and Father. The Department intended to put the boys into the home for longer extended periods, but before doing so, Parents were required to obtain a second crib, and Mother was to obtain letters from her doctors indicating her mental and physical health issues had been addressed. The Department did not receive all of the necessary releases until April, 2006. Mother refused to sign release of information forms, with the exception of one for Six County, until March, 2006.
 {¶ 11} After receiving and reviewing the medical records from Southeast Ohio Regional Medical Center in Guernsey County, and Genesis Healthcare Systems in Muskingum County, Davis had additional concerns because of Mother's "almost daily *Page 7 
visits" to emergency rooms. When asked how hard she had tried to put the children back in the home, Davis replied, "You know what, I have tried harder with this family. I've never had a family, it seemed like every time I wanted to put the children in the home, they fought against me. Usually people say, `We want our children back'. `Why aren't you letting us'? I would say `Let's start these visitations longer' and then they would come up with a reason not to do it." February 21, 2007 Tr. at 87. Davis added Mother's mental health issues as well as her physical health issues, evidenced by her numerous trips to emergency rooms, remained concerns. Davis indicated she did not believe there was a great deal of parental commitment.
 {¶ 12} Dr. Howard Beazel, a psychologist, was asked by the Department to review Mother's medical records. Dr. Beazel did not treat Mother or Father. Based upon his review of the records, Dr. Beazel opined Mother showed characteristics consistent with the definition of drug seeking behavior, which is also consistent with substance dependence. Dr. Beazel added the records indicated Mother had been prescribed multiple narcotics, including Nubain, Dilaudid, Vicodin, Percocet, and Demerol. The records further revealed Mother had over one hundred hospital admissions over a two year period, and was routinely given an injection of a narcotic as well as prescriptions for narcotics.
 {¶ 13} Dr. Darrell Smith, a psychiatrist with Six County, testified Parents have been his patients for several years. Dr. Smith explained Mother suffered from a mood disorder, and he prescribed medication designed to help ameliorate the mood swings and impulsivity associated with that illness. The doctor observed significant improvement in Mother over the last several months. Dr. Smith saw nothing in Parents' *Page 8 
presentation during his most recent contact with them which would suggest they were unable to make reasonable and rational decisions with regard to meeting the twins' needs.
 {¶ 14} On cross-examination, Dr. Smith indicated Mother was currently taking, on a daily basis, Seroquel, a mood stabilizer; Nortriptyline, an antidepressant; Alprazolam, an anti-anxiety medication; Tegretol, a mood stabilizer; Cymbalta, an antidepressant, which augments the effects of Nortriptyline; and Lamictal, a mood stabilizer. Dr. Smith saw no particular problem in terms of drug interaction with Mother's taking narcotic pain killers in addition to the medications he prescribed. The doctor stated the number of visits Mother made to emergency rooms would not be excessive if she was experiencing severe, frequent migraine headaches such as those of which Mother complained. Dr. Smith noted narcotics are used in the treatment of migraines when other prophylactic measures have failed. Father's current psychiatric diagnosis is generalized anxiety disorder. Mother's diagnosis is bipolar-2 disorder and chronic migraines. Dr. Smith explained individuals diagnosed with bipolar-2 disorder are subject to mood swings ranging from depression to normal moods, but do not reach the elation state found in a bipolar-1 individuals. Dr. Smith added individuals with bipolar-2 disorder are particularly susceptible to post-partum depression. Dr. Smith acknowledged Mother suffered from severe depression, but her moods had stabilized sometime in August, 2005, and she continued to improve. When asked how a bipolar-2 diagnosis would effect an individual's ability to parent, Dr. Smith answered, during a depressive episode, the person may have difficulty motivating, become withdrawn, sleep deprived, and irritable. *Page 9 
 {¶ 15} During the guardian ad litem's cross-examination of Dr. Smith, the doctor indicated he sees Mother and Father every three or four months, with a typical session lasting ten to fifteen minutes. The guardian asked the doctor about substance induced mood disorder, which Dr. Smith defined as a mood disorder caused by a chemical either a pharmaceutical or street drug. The symptoms of substance induced mood disorder include sleeplessness, weight loss, loss of appetite, apathy, withdrawal, times of anger and resentment, and depression. Dr. Smith testified he did not feel such a diagnosis would be appropriate for either Mother or Father. Dr. Smith agreed depression and headaches could be caused by withdrawal in an individual with substance abuse problems.
 {¶ 16} Vicky Santos, a licensed clinical social worker, testified she is a psychotherapist at Six County as well as Source One. Santos has met with Mother 43 times since August, 2004, at the Muskingum Counseling Center. Mother initially saw Santos to address the acute grief she was experiencing after the death of her infant son, Jason. Approximately one month into the counseling relationship, Mother informed Santos she was pregnant. Santos labeled Mother's situation as complicated bereavement as the news of the pregnancy complicated the bereavement the couple was experiencing for Jason. Mother experienced a great deal of helplessness, worthlessness, hopelessness and self-blame, needing to review all of the events which occurred prior to Jason's death. Santos treated Mother throughout her pregnancy and was still treating her at the time of the hearing.
 {¶ 17} Santos recalled, after the twins were born, Mother became more withdrawn, and her affect became flatter. Mother would become agitated and irritable *Page 10 
when she discussed her own mother. Mother and the twins were released from the hospital on the date of the first anniversary of Jason's death. According to Santos, the time connection coupled with the emotional connection between the twins and Jason added to Mother's depression. Doctors initially suspected the twins had heart murmurs, and Parents feared the newborns would have the same condition as Jason. Although Mother was relieved after learning the heart murmurs were not life threatening, her grief over Jason continued to overwhelm her. Santos observed a remittance of Mother's acute grief symptoms in December, 2005, and January, 2006. Mother focused less on Jason, and focused more on what was required of her to bring the twins home. Santos described Mother as stable, explaining she still had a mood disorder, but the acute disturbance had dissipated. Although Santos knew Mother and Father had lost custody of other children, she did not know the exact number of children, and Mother had referenced only two of them by name. Mother expressed anger toward the Department over the loss of her other children, but took no responsibility for those losses. Santos testified Mother was not overwhelmed with grief over the loss of her other children.
 {¶ 18} After hearing all the evidence the trial court took the matter under advisement. Via Entry filed March 27, 2007, the trial court terminated Parents' parental rights, privileges and obligations with respect to Joshua and Jordan, and granted permanent custody of the children to the Department. Neither party requested Findings of Fact and Conclusions of Law.
 {¶ 19} It is from this entry Parents appeal, raising the following assignments of error: *Page 11 
 {¶ 20} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 21} "II. THERE WAS NOT CLEAR AND CONVINCING EVIDENCE FOR THE TRIAL COURT TO FIND THAT THE MINOR CHILDREN SHOULD NOT BE PLACED WITH APPELLANTS AND THAT IT WAS IN THE MINOR CHILDRENS' [SIC] BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF MUSKINGUM COUNTY CHILDREN'S SERVICES."
 {¶ 22} This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.1(C).
 I, II {¶ 23} Because Parents' assignments of error require similar analysis, we shall address said assignments of error together. In their first assignment of error, Parents maintain the trial court's finding it would be in the best interest of the children to grant permanent custody to the Department was against the manifest weight and sufficiency of the evidence. In their second assignment of error, Parents contend the trial court's finding Joshua and Jordan cannot and should not be placed with them was against the manifest weight of the evidence.
 {¶ 24} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments *Page 12 
supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. CE. Morris Co. v. Foley Constr. (1978),54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 25} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 26} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 27} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home *Page 13 
providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 28} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 29} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R .C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 30} Parents submit the evidence presented at the permanent custody hearing does not support a finding of any of the factors set forth in R.C. 2151.414(E).
 {¶ 31} In its March 27, 2007 Entry, the trial court specifically found:
 {¶ 32} "a. Mother was given a case plan and failed to comply with the objectives within a six-month period. *Page 14 
 {¶ 33} "b. Father was given a case plan and failed to comply with the objectives within a six-month period.
 {¶ 34} "c. Mother has a long history of narcotic-seeking behavior.
 {¶ 35} "d. Mother suffers from a personality disorder.
 {¶ 36} "e. Mother and Father have had six other children permanently removed from their custody through Guernsey County, Ohio Juvenile Court.
 {¶ 37} "f. Mother and Father have a lengthy history with Guernsey County Children Services and MCCS, regarding issues of poor parenting, violence in the home, substance abuse, the Mother's mental health, and abdication of parental roles.
 {¶ 38} "g. Muskingum County Children Services also has a history with the mother and Father with respect to another child of Father's [sic], Sara Richardson.
 {¶ 39} "h. The Mother and Father's grief over the untimely death of their child, Jason, has hindered their ability to parent. Mother suffered from severe depression even after the birth of the minor children.
 {¶ 40} "i. Mother and Father rejected the Caseworker's attempts to place the children back in their home for longer periods of time.
 {¶ 41} "j. Mother and Father's visitations with the minor children at the offices of MCCS are habitually chaotic. Mother threatened a caseworker at one point.
 {¶ 42} "k. The children are likely to suffer from neglect or abuse in the future if returned to Mother and Father, based upon the Mother's narcotic-seeking behavior, and the parents' failure to correct the problems underlying the need for removal."
 {¶ 43} March 27, 2007 Entry. *Page 15 
 {¶ 44} As set forth in the Statement of the Case and Facts, supra, Laine Davis, the Department case worker, testified Mother's mental health issues as well as her physical health as evidenced by her numerous hospital visits continued to remain concerns. Mother's parental rights were terminated with respect to six other children, three of those being fathered by Father. Father's parental rights with respect to those three children had also been terminated. Department supervisor Lori Moore testified she reviewed all of Mother's medical records and had concerns regarding Mother's numerous emergency room visits. Moore noted Mother had 114 emergency visits between April, 2005, and the date of the hearing, which amount to Mother seeking medical care on an average of every six days. Moore expressed concerns if Mother was that ill, or, alternatively, if she were not that ill, but having all those visits, such could prevent her from parenting appropriately. Mother leaves these visits with numerous prescriptions for pain medications.
 {¶ 45} Dr. Beazel reviewed Mother's medical records, noting there were over 100 records from one hospital in Guernsey County. Mother presented at the hospital requesting and/or demanding narcotic painkillers. At these visits, Mother was almost routinely given an injection and/or prescription for a narcotic, in addition to other pain medications which had been prescribed for her by other physicians. Father denied any abuse by Mother. In fact, Father accompanied Mother to most, if not all, of the ER visits.
 {¶ 46} Parents' thwarted the Department's attempts to place the children in the home for longer periods of time. Mother advised the Department her psychiatrist did not *Page 16 
believe she was ready to have the boys for extended periods of time. Dr. Smith testified he never advised Mother of such.
 {¶ 47} Based upon the foregoing as well as the entire record in this matter, we find the trial court's findings it was in the best interest of the children to grant permanent custody to the Department, and the children could not or should not be placed with parents are supported by clear and convincing evidence.
 {¶ 48} Mother and Father's first and second assignments of error are overruled.
 {¶ 49} The Judgment of the Muskingum County Court of Common Pleas, Juvenile Division, is affirmed.
 Hoffman, P.J. Wise, J. and Edwards, J. concur *Page 17 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to Appellants. *Page 1